# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 3, 2006        Decided July 14, 2006

No. 04-1413

MOBILE RELAY ASSOCIATES AND
SKITRONICS, L.L.C.,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

SPRINT NEXTEL COMMUNICATIONS, INC. *ET AL.*,
INTERVENORS

———

On Petition for Review of Orders of the
Federal Communications Commission

———

*David J. Kaufman* argued the cause for the petitioners.

*Joel Marcus*, Counsel, Federal Communications Commission, argued the cause for the respondents. *Thomas O. Barnett*, Acting Assistant Attorney General, *Robert B. Nicholson* and *James J. Fredricks*, Attorneys, United States Department of Justice, and *Samuel L. Feder*, General Counsel, and *Daniel M. Armstrong*, Associate General Counsel, Federal Communications Commission, were on brief. *Laurel R.*

*Bergold*, Counsel, Federal Communications Commission, entered an appearance.

*Christopher J. Wright* argued the cause for intervenors Sprint Nextel Corporation *et al*. *Timothy J. Simeone, Christine M. Gill*, and *Martin William Bercovici* were on brief.

Before: SENTELLE, HENDERSON and TATEL, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Mobile communications operators Mobile Relay Associates (MRA) and Skitronics petition for review of two orders of the Federal Communications Commission (FCC or Commission) reconfiguring the electromagnetic spectrum's 800 MHz band. The reconfiguration plan, which the Commission established to eliminate interference with public safety communications, segregates different communications system architectures in separate newly-established segments of the band. Under the plan, MRA and Skitronics, 800 MHz licensees which operate Specialized Mobile Radio (SMR) systems that broadcast signals from a base station antenna situated at a high elevation, will be segregated from licensees who operate Enhanced Specialized Mobile Radio (ESMR) systems, which use smaller and more numerous base stations and a cellular network architecture. Pursuant to the plan's restrictions licensees required to move to parts of the band set aside for SMR use will be unable to use that spectrum to operate ESMR services. MRA and Skitronics argue the reconfiguration plan arbitrarily treats them differently from similarly situated licensees, constitutes unlawful retroactive agency action and unconstitutionally takes their protected interest in spectrum. They also claim that the FCC overvalued spectrum offered by Nextel Communications, Inc. (Nextel)

pursuant to the spectrum migration. In addition MRA claims that the Commission was obligated to compensate it for its customer loss resulting from the migration. Nextel and fellow ESMR licensee Southern LINC intervene, arguing the Commission's orders are lawful. For the reasons set forth below, we deny the petition for review.

I.

Since the 1970s the FCC has licensed spectrum in the 800 MHz band to a variety of licensees providing mobile communications. At that time technology did not allow for contiguous spectrum use by a single user so a large part of the 800 MHz band was "interleaved," with different kinds of communications technologies operating on adjacent frequencies in the band. *Improving Public Safety Communications in the 800 MHz Band; Consolidating the 900 MHz Industrial/Land Transportation and Business Pool Channels, Notice of Proposed Rule Making* (NPRM), 17 F.C.C.R. 4873, 4877 (2002). Because of the minimal restrictions the Commission placed on the band's use, licensees operating in it have developed a number of different network architectures to provide mobile communications for users. One technology is a high-site system, whose network architecture consists of a large antenna placed at a high elevation such as a tower, mountain, hilltop or tall building transmitting a signal across a roughly circular geographical area with the antenna at the center. In a high-site system the system operator assigns a network user to one channel or frequency on which a base unit and all mobile radio units on that user's network operate. Signal propagation physics dictate that the farther a mobile unit is from the central antenna, the weaker the signal. *Id.* at 4879–80.

Around 1980 the FCC began licensing 800 MHz band spectrum use to public safety providers like police and fire departments and medical rescue teams, which use their spectrum

space to develop and operate mobile communications systems by which first responders communicate with each other and with their dispatchers via hand-held or vehicular mobile radio units.[1] *Id*. The Commission also licensed frequencies in the band to commercial licensees using high-site network architecture known as Specialized Mobile Radio (SMR) systems. The typical commercial service provided on an SMR system is service for taxicab companies, service fleets and other businesses requiring mobile communications which, like high-site public safety communications systems, use a dispatcher. The mobile units are all tuned to the same station and can both listen and respond. An SMR licensee sells communications services to subscribers which use the licensee's equipment and network architecture for mobile communications operations.

Later 800 MHz licensees developed "enhanced" SMR, or ESMR, systems. In an ESMR system the system operator divides the service area into several multiple antenna sites, placed at a lower altitude, each of which is called a "cell" and operates at a lower power and covers a smaller area than an SMR high-site antenna.[2] Unlike the SMR system, in which the operator assigns the user a single channel for the entire service area, in the ESMR system the same channel may be used in non-adjacent cells by different users at the same time. As the mobile

---

[1]Public safety providers also use high-site systems because they are relatively inexpensive to set up and operate.

[2]Traditional cellular telephone systems are similar to ESMR systems in terms of their system architectures and the service they provide to consumers but they operate in a different spectrum band and use somewhat different technology. *Improving Public Safety Communications in the 800 MHz Band*, 19 F.C.C.R. 14969, 14971 n.7 (2004). Unlike other cellular telephone providers, intervenors Nextel and Southern LINC operate in the 800 MHz band.

unit moves from one cell to another, the communications link is automatically "handed off" to the next cell and the channel switches with no noticeable effect on the user. The ESMR system can support a greater number of users than the SMR system and, because it allows for a frequency's reuse within the same system, is a more efficient—and therefore more profitable—use of spectrum. *Id.* at 4880.

The Commission issued two types of 800 MHz licenses for the two different system architectures. Consistent with SMR system use, the Commission first issued a site-based license to an 800 MHz band operator, which license it granted free of charge and allowed the user to construct a transmitter at a specific site. The site-based license gives the licensee the right to serve a particular area defined by the FCC via reference to the territory covered by the licensee's proposed high-site base station. In the mid-1990s the FCC began auctioning economic area (EA) licenses in the 800 MHz band, which license authorized the licensee to serve a large geographic area, usually defined by political boundaries, from any site or sites the licensee chose, subject to the rights of pre-existing incumbent site-based licensees already licensed to operate in that geographic area.

As ESMR system use increased, so too did interference with the high-site public safety systems in the 800 MHz band. The source of the interference was the overlap of the different architectures and their operations' proximity on the spectrum, particularly where a public safety mobile or portable radio was within an ESMR transmitter's range. Specifically, public safety radio users experienced coverage loss in areas where adequate coverage previously existed within their site-based system. For example, if an en route police officer or firefighter near the outermost border of his site-based network's range attempted to communicate by portable radio with a distant base station and

6

was also within the range of a low-power, low-elevation cell site using an adjacent band frequency, his communication could be disrupted and he could miss a critical transmission from his base station or be unable to call for assistance.[3]  In 2002 the FCC initiated a rulemaking and solicited proposals to remedy the interference problem.  NPRM, 17 F.C.C.R. 4873 (2002).  In response to the NPRM a wireless service provider coalition including intervenor Nextel, the largest 800 MHz licensee and ESMR system operator in the United States, proposed that the Commission segregate high-site and ESMR systems into a separate block of the 800 MHz band (the Consensus Plan). Nextel offered for public safety use part of its 800 MHz spectrum holdings in what the FCC previously called the "General Category" part of the band.  Because moving to a new part of the spectrum band is an expensive process, requiring retuning or even replacing the licensee's (and, for commercial operators, their customers') equipment to operate on the new frequency, Nextel also agreed to pay the costs associated with the relocation of all current 800 MHz licensees.  Nextel, as an interference-causing ESMR provider, proposed to move its operations to a new block of spectrum in the 800 MHz band

---

[3]The Commission identified two types of interference caused by cellular systems to which high-site systems were susceptible: out of band emission (OOBE) interference, where a signal spills over a transmitter's licensed frequency into adjacent spectrum, and intermodulation interference, where two signals in use in a particular cell mix within the mobile radio to form a third frequency that nullifies the desired signal.  In the first type of interference the mobile radio picks up a cellular system's signal on an adjacent frequency, thereby interfering with communications with the base station.  In the second type of interference the third frequency blocks the channel on which the mobile radio attempts to communicate.

dedicated exclusively to ESMR operations. In exchange it also sought new spectrum in the 1.9 GHz band.[4]

In a Report and Order released on August 6, 2004 the Commission largely adopted the Consensus Plan's structural solution, dividing the 800 MHz band into several smaller blocks and assigning ESMR cellular operations, high-site public safety and commercial SMR operations to the appropriate blocks according to their respective network architectures. *Improving Public Safety Communications in the 800 MHz Band; Consolidating the 800 and 900 MHz Industrial/Land Transportation and Business Pool Channels*, *Report and Order, Fifth Report and Order, Fourth Memorandum Opinion and Order, and Order*, 19 F.C.C.R. 14969 (2004) (Rebanding Decision).[5] The Commission recognized the 800 MHz band's *mélange* of "generally incompatible" high-site and cellular technologies as the "root cause" of the interference; thus it decided that creating new frequency blocks and "placing similar system architectures in like spectrum and isolating dissimilar architectures from one another" would minimize interference. Rebanding Decision ¶¶ 3, 22. The five smaller blocks of frequencies created by the Rebanding Decision are as follows:

---

[4]Frequencies in the 1.9 GHz band are used to offer broadband personal communications services (PCS) such as high-speed wireless Internet service.

[5]The Commission later amended and clarified the Rebanding Decision with three *Errata* and a Supplemental Order released on December 22, 2004. *Improving Public Safety Communications in the 800 MHz Band*, 19 F.C.C.R. 25120 (2004) (Reconsideration Order). The petitioners' challenge encompasses the Rebanding Decision, the *Errata* and the Reconsideration Order. Pet'rs' Br. 1.

- A 6 MHz spectrum block at the 800 MHz band's lower end dedicated exclusively to public safety radio communication systems (the NPSPAC block). All *private* users then-located in this portion of the band must move to new spectrum.

- An "interleaved" block for both public safety and private systems. Most of the non-public safety operators that remain in the interleaved block under the plan are SMR licensees that operate high-site systems. A licensee in the interleaved block can implement cellular architecture without prior approval from the Commission so long as the licensee does not operate a "high density" cellular system as 47 C.F.R. § 90.7 defines that term. A high density system uses especially low antenna sites and especially small cells; ESMR systems were the spectrum use-intensive high density cellular systems that principally caused interference with public safety and commercial SMR systems.[6]

- An "expansion" block and a "guard" block to provide additional spectral separation between ESMR users and public safety and SMR users. Public safety channels currently operating on expansion block frequencies can relocate at their election. Non-high-density ESMR operators can operate in the expansion and guard blocks subject to strict interference guidelines. Rebanding Decision ¶¶ 154–58.

---

[6]The Rebanding Decision defines a "high-density cellular system" as an ESMR system with more than five overlapping interactive cells featuring "hand-off" capability (i.e., the capability to "hand off" calls from one cell to the next as a user moves through the coverage area) and with at least one site that uses a low elevation antenna as the Rebanding Decision defines that term. Rebanding Decision ¶ 172.

• The ESMR block, reserved for licensees operating ESMR systems. All high-density ESMR systems are required to migrate to the ESMR block. No non-cellular system can operate in the ESMR block. The Commission recognized that in some cases the proposed ESMR block would not contain sufficient spectrum to accommodate all ESMR users' systems. Accordingly, to allow intervenor Southern LINC, a large ESMR operator in the Southeast, to migrate to the ESMR block, the Commission expanded the size of the ESMR block in those counties where Southern LINC provides service. Rebanding Decision ¶¶ 164–66. The Commission allowed Southern LINC and Nextel to reach a private arrangement regarding spectrum-sharing in the ESMR block.

The Rebanding Decision required many 800 MHz band users, including Nextel and MRA, to relocate to different parts of the spectrum. Many SMR and ESMR licensees, for example, were located in what had been the General Category block but was slated to become the new NPSPAC block; under the new configuration those licenseholders would have nonconforming operations and therefore had to move. The Commission stated that it was "committed to ensuring" that the band reconfiguration would not result in the degradation of existing service, Rebanding Decision ¶ 26, and assigned relocation details to a Transition Administrator appointed by and reporting to the Commission. *Id.* at ¶ 201. To compensate Nextel for its offer to pay all relocation costs, the Commission adopted a "value for value" approach under which it would determine the value of the 800 MHz spectrum Nextel was forfeiting, plus relocation costs, and then offset that amount against the estimated value of the 1.9 GHz replacement spectrum Nextel requested as well as Nextel's spectrum in the new ESMR block. Rebanding Decision ¶ 212.

MRA, an SMR licensee operating in Colorado, provides two-way communications services from four high-site locations with overlapping service areas covering metropolitan Denver. Pet'rs' Br. 9. Its licenses are all of the site-based type. Approximately half of its 800 MHz band spectrum is located in the NPSPAC block and those operations are thereby scheduled for migration to the interleaved block at Nextel's expense. The other half of its 800 MHz band spectrum is already located in the interleaved block. Under the reconfiguration MRA will be unable to develop a high-density ESMR architecture network using its spectrum. Skitronics, an SMR licensee operating in the Carolinas and West Virginia, holds 800 MHz site-based and EA licenses in the interleaved block.[7] Its site-based licenses are located within the geographic boundaries of the EA licenses it subsequently acquired at auction.[8] It provides mobile communications via two-way mobile dispatch services for taxicab companies, trucking companies and other small businesses. Like MRA, it also operates multi-cell SMR systems in each of its markets and its customers can manually re-key to a new channel when passing out of the range of one cell and into

---

[7]As noted, the Rebanding Decision does not require a licensee currently located in the interleaved block to move; however, the licensee may relocate to the ESMR block at its own expense on the condition it converts its operations to cellular architecture so as to operate as an ESMR system in the ESMR block. Reconsideration Order ¶ 81.

[8]Skitronics won auctions for EA licenses in the Charleston, West Virginia, Columbia, South Carolina, and Wilmington, North Carolina EAs, intending to use each license to construct an ESMR system in conjunction with its site-based license. *See* Pet'rs' Br. 11; *Improving Public Safety Communications in the 800 MHz Band*, Skitronics Comments, WT Docket No. 02-55, at 3-4 & n.4 (May 6, 2002).

another. *Id.* at 11. MRA and Skitronics petition for review of the Rebanding Decision under 47 U.S.C. § 402(a).

## II.

We have jurisdiction to review FCC rulemaking orders under the Communications Act, 47 U.S.C. § 402, and the Judicial Review Act, 28 U.S.C. § 2342. Under the Administrative Procedure Act we reverse an agency's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To pass our review the agency need only articulate a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Ins. Co.*, 463 U.S. 29, 43 (1983) (*State Farm*) (quotations and citation omitted). In reviewing an FCC order, we "presume the validity of the Commission's action and will not intervene unless the Commission failed to consider relevant factors or made a manifest error in judgment." *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 300 (D.C. Cir. 2003). We have previously declared that if the Commission is "fostering innovative methods of exploiting the spectrum," it "functions as a policymaker" and is "accorded the greatest deference by a reviewing court." *Teledesic LLC v. FCC*, 275 F.3d 75, 84 (D.C. Cir. 2001) (quotation omitted). We uphold the Commission if it makes a "technical judgment" that is supported "with even a modicum of reasoned analysis," "absent highly persuasive evidence to the contrary." *Hispanic Info. & Telecomm. Network v. FCC*, 865 F.2d 1289, 1297–98 (D.C. Cir. 1989).

MRA and Skitronics make five challenges to the Rebanding Decision, claiming the FCC (1) arbitrarily treated them differently from similarly situated intervenors Nextel and Southern LINC; (2) engaged in unlawful retroactive rulemaking and, alternatively, even if its action constituted permissible "secondary retroactivity" under *Bowen v. Georgetown*

*University Hospital*, 488 U.S. 204 (1988), its action was unreasonable; (3) confiscated their spectrum rights without compensation in violation of the Takings Clause of the Fifth Amendment to the United States Constitution; (4) unreasonably declined to reimburse MRA for "churn," or loss of subscribers, due to migration; and (5) undervalued the new spectrum granted to Nextel pursuant to the Consensus Plan. We believe that the first four claims lack merit and that MRA and Skitronics lack standing to bring the fifth.

A.

MRA and Skitronics first claim they are similarly situated to Nextel and Southern LINC in that they are 800 MHz licensees operating multi-cell SMR systems. Like Nextel and Southern LINC, they also held spectrum rights which allowed them to develop more efficient spectrum-use architectures and to deploy newer equipment, i.e., convert to ESMR. Despite these similarities, however, under the Rebanding Decision the FCC assigned Nextel and Southern LINC to the ESMR block, which allows them to operate ESMR systems, and assigned MRA and Skitronics to the interleaved block, which is dedicated to SMR operations, thus depriving them of the flexibility to convert to high-density ESMR architecture in the future. MRA and Skitronics argue the Commission therefore acted arbitrarily in allowing Nextel and Southern LINC to move into the ESMR block without affording them the same right.

Despite the similarities they claim to share with Nextel and Southern LINC, MRA and Skitronics acknowledged both to the Commission during the rulemaking process and to us on brief that their current operations do not meet the Commission's definition of "cellular" under the Rebanding Decision. *See Improving Public Safety Communications in the 800 MHz Band*, Reply MRA Comments, WT Docket No. 02-55, at 2 (Aug. 7, 2002) ("MRA holds numerous licenses used for both internal

communications and service to customers, all of which operate analog-only using the same type of system architecture (*i.e.*, high elevation, high-power repeater transmitter, reaching mobile and portable units over a large geographic area) as do most other traditional SMR . . . and Public Safety Licensees in the 800 MHz band."); *Improving Public Safety Communications in the 800 MHz Band*, Skitronics Comments, WT Docket No. 02-55, at 2 (May 6, 2002) ("Skitronics presently only offers traditional SMR mobile dispatch services . . . ."); Pet'rs' Br. 9 ("MRA's high-site system . . . lacks hand-off capability . . . ."); *id.* at 26 ("Petitioners' current operations do not meet the FCC's definition of 'cellular' for this proceeding, *i.e.*, at least five overlapping cells with hand-off" capability.). This distinction alone is a sufficiently reasonable basis for the FCC's different treatment of the SMR and the ESMR licensees. The Commission's stated purpose in its Rebanding Decision was to create distance on the spectrum between systems with high-site architecture—i.e., SMR operators as well as public-safety operators—and ESMR systems in order to reduce harmful interference caused by the ESMR systems. *See* Rebanding Decision ¶ 3 (reconfiguration of the 800 MHz band is intended to separate "generally incompatible technologies" whose current proximity to each other is the identified "root cause" of unacceptable interference). Because the ESMR systems caused the interference with high-site public safety and SMR systems, it was reasonable for the Commission to segregate MRA and Skitronics, both high-site SMR system operators, from the new ESMR block.

MRA and Skitronics rely on our decision in *Melody Music v. FCC*, 345 F.2d 730 (D.C. Cir. 1965), for the proposition that the Commission cannot discriminate within a class of licenses. There the FCC refused to renew the license of a radio station operator who had secretly given assistance to contestants in answering questions on a number of television quiz shows the

licensee had produced. At the same time, however, the Commission, making no mention of the network's role (or lack of role) in the deception, had granted several license renewals to NBC, which aired and for a time owned the tainted quiz shows. The radio station operator appealed the FCC's denial of its request for license renewal and we concluded that the Commission's "refusal at least to explain its different treatment of appellant and NBC was error." *Id.* at 732. Because the Commission did not "explain the relevance of those differences [between NBC and the radio station] to the purposes of the Federal Communications Act," we remanded the matter for it to explain its decision to treat the two renewal applicants differently, given that both "were connected with the deceptive practices and their renewal applications were considered by the Commission at virtually the same time." *Id.* at 733, 732. In *Melody Music*, we concluded the FCC's decision to treat the two licensees differently was arbitrary and capricious because it did not give an adequate explanation for doing so. *See also Tel. & Data Sys. v. FCC*, 19 F.3d 655, 657 (D.C. Cir. 1994) (FCC's explanation for not applying prior prevailing standard was "intolerably mute" rather than "tolerably terse" and therefore matter was remanded for more fully articulated rationale) (quoting *Action for Children's Television v. FCC*, 821 F.2d 741, 746 (D.C. Cir. 1987)). Here, by contrast, the FCC adequately explained its rationale for treating SMR systems differently from ESMR systems—high-site systems like those operated by MRA and Skitronics, as well as by public safety entities, suffered from interference due to the cellular architecture of licensees like Nextel and Southern LINC. Unlike the two licensees in *Melody Music*, the licensees here are not similarly situated—Nextel and Southern LINC operate cellular systems and MRA and Skitronics do not—and the FCC explained in detail why their differences justify differential treatment. *See* Rebanding Decision ¶ 3 (high-site and cellular systems

"generally incompatible"); *id.* ¶ 22 (segregation will "minimize unacceptable interference in the 800 MHz band by placing similar system architectures in like spectrum and isolating dissimilar architectures from each other"). The Commission's decision to authorize Nextel's and Southern LINC's move to the ESMR block but not to allow MRA and Skitronics the same move was eminently reasonable.

B.

Skitronics also claims the FCC engaged in retroactive rulemaking because Skitronics had purchased eight EA 800 MHz SMR licenses at auction with the expectation that they could be used for a number of operations, including ESMR operations, as business permitted.[9] With the Rebanding Decision, however, Skitronics maintains, the Commission retroactively impaired the rights—namely Skitronics' right before the Rebanding Decision to use its eight EA licenses to operate an ESMR system in the future—Skitronics had bargained for at auction.

In their reply brief, MRA and Skitronics discussed the FCC's Reconsideration Order which, inter alia, provided "Skitronics partial relief by allowing it" and other EA licensees "to move immediately to the ESMR [block] with its entire system," including its site-based systems, "operating high-site in the short term if it must, so long as it converts its entire system to ESMR before the end of its current license term of March 21, 2011." Pet'rs' Reply Br. 3 (citing *Improving Public Safety Communications in the 800 MHz Band: Memorandum Opinion and Order*, 20 F.C.C.R. 16015, 16027 ¶ 25 (2005)

---

[9]At the time of the Rebanding Decision it appears MRA held only site-based licenses and therefore does not join the retroactivity argument. *See* Pet'rs' Br. 12 n.5; Resp't's Br. 32.

(Reconsideration Order)). While the Rebanding Decision had dedicated the ESMR block exclusively for the use of ESMR systems, the Reconsideration Order allowed non-ESMR licensees to relocate both their EA and site-based licenses to the ESMR block so long as the site-based licenses were part of an "integrated communications system" at the time of the Rebanding Decision. Reconsideration Order ¶ 25.[10] Because Skitronics had an "integrated communications system" when the Rebanding Decision issued, it retains the ability to move to the ESMR block so long as it converts to ESMR by the end of its current license term.

Still, despite the Reconsideration Order, Skitronics' claim is not moot. Although Skitronics now has the ability to move to the ESMR block and convert to ESMR architecture, it must convert to ESMR by 2011, a limitation on its license that would not exist were we to grant the relief it seeks.[11] On the merits,

---

[10]The Commission made this change in recognition of the fact that EA licenseholders' networks sometimes "employ a patchwork of EA-based and site-based licenses." *See* Rebanding Decision ¶ 163; Reconsideration Order ¶ 25.

[11]Skitronics also claims that the Reconsideration Order granted it only partial relief because the Rebanding Decision treated it unfairly compared to Southern LINC in terms of reimbursement expenses and coverage footprint; the different treatment of Southern LINC and Skitronics is legitimate, however, because, as discussed in Part II.A *supra*, they are not similarly situated and the Commission acted reasonably in treating them differently. Skitronics' additional challenge to the Reconsideration Order because, it alleges, it was treated differently from mobile communications operators Airpeak and Airtel is not properly before us as the challenge appeared for the first time in the reply brief. *See AT&T v. FCC*, 974 F.2d 1351, 1354 (D.C. Cir. 1992) ("complainants [must], before coming to court, . . . give the FCC a fair opportunity to pass on a legal or factual argument")

however, the retroactivity claim fails. Retroactive rules "alter[] the *past* legal consequences of past actions." *Bowen*, 488 U.S. at 219 (Scalia, J., concurring) (emphasis in original). However, an agency order that "alters the future effect, not the past legal consequences" of an action, *Sinclair Broad. Group v. FCC*, 284 F.3d 148, 166 (D.C. Cir. 2002), or that "upsets expectations based on prior law," *DirecTV, Inc. v. FCC*, 110 F.3d 816, 826 (D.C. Cir. 1997) (quotation omitted), is not retroactive. While the Rebanding Decision may have frustrated Skitronics' expectation that it would be able to operate an ESMR system in its then-current spectrum allotment, the effect of the Rebanding Decision is purely prospective. To conclude otherwise would hamstring not only the FCC in its spectrum management, but also any agency whose decision affects the financial expectations of regulated entities. As we stated in *Chemical Waste Management v. EPA*, 869 F.2d 1526 (D.C. Cir. 1989),

> It is often the case that a business will undertake a certain course of conduct based on the current law, and will then find its expectations frustrated when the law changes. This has never been thought to constitute retroactive lawmaking, and indeed most economic regulation would be unworkable if all laws disrupting prior expectations were deemed suspect.

*Id.* at 1536. As in *Chemical Waste Management*, Skitronics "finds its present range of options constrained by its own past actions [the purchase of EA licenses at auction] even though it could not have foreseen those consequences when the action

---

(quoting *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1163 (D.C. Cir. 1987)).

occurred. This does not, however, make the rule a retroactive regulation." *Id.*

Secondary retroactivity—which occurs if an agency's rule affects a regulated entity's investment made in reliance on the regulatory status quo before the rule's promulgation—will be upheld " 'if it is reasonable,' i.e., if it is not 'arbitrary' or 'capricious.' " *DirecTV*, 110 F.3d at 826 (citation omitted); *see Sinclair*, 284 F.3d at 166 (if Commission rule is "[a]t most" secondarily retroactive, "the only question is whether the agency's action is reasonable"). The Rebanding Decision was reasonable because, as discussed earlier, the Commission sought to segregate incompatible mobile communications architectures to reduce interference with high-site public safety systems pursuant to its public interest mandate. *See DirecTV*, 110 F.3d at 826 ("A change in policy is not arbitrary or capricious merely because it alters the current state of affairs. The Commission is entitled to reconsider and revise its views as to the public interest and the means needed to protect that interest if it gives a reasoned explanation for the revision.") (quotation omitted).

## C.

MRA and Skitronics also make a constitutional claim: In reconfiguring the 800 MHz band the Commission has unlawfully taken their property in violation of the Takings Clause because the segregation of the SMR system architectures to parts of the 800 MHz band that do not allow for conversion to ESMR architecture reduces the value of their spectrum assignments. MRA and Skitronics held 800 MHz SMR spectrum licenses which, until the reconfiguration of that band, entitled them to operate either high-site SMR or cellular ESMR systems and to progress from one mode to the other if business needs required. The FCC's action deprives them of this flexibility without compensation, they argue, and therefore constitutes an unconstitutional taking.

The Commission grants a licensee the right to "the use of" the spectrum for a set period of time "but not the ownership thereof." 47 U.S.C. § 301; *see also FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, 475 (1940) ("The policy of the [Communications] Act is clear that no person is to have anything in the nature of a property right as a result of the granting of a license."); *NBC v. FCC*, 516 F.2d 1101, 1191 (D.C. Cir. 1975) (spectrum "is not the private property of any individual or group") (Tamm, J., supporting order vacating grant of en banc rehearing and remand to FCC), *cert. denied*, 424 U.S. 910 (1976). Moreover, the Commission has the unilateral authority, provided it gives notice to the licensee, to modify a license "either for a limited time or for the duration of the term thereof, if in the judgment of the Commission such action will promote the public interest, convenience, and necessity." 47 U.S.C. § 316(a)(1). Broadly defined, the licenses MRA and Skitronics hold confer the right to use the spectrum for a duration expressly limited by statute subject to the Commission's considerable regulatory power and authority. This right does not constitute a property interest protected by the Fifth Amendment.

## D.

MRA next maintains that even if the FCC validly reconfigured the 800 MHz band, it nonetheless acted arbitrarily in refusing to compensate MRA for the inevitable customer loss, or "churn," that it will suffer as a result of the migration. A migrating 800 MHz SMR can expect customer churn in the range of 50 per cent when it migrates, MRA claims, and its losses due to churn will amount to more than a million dollars. Pet'rs' Br. 40–41. MRA asserts the FCC's failure to include compensation for churn in calculating Nextel's reimbursement of other relocation costs is arbitrary and capricious. Not so.

MRA estimates its customer loss based on an earlier migration from the 800 MHz band that occurred when it sold 800 MHz channels to Nextel and moved its customers to systems operating below 512 MHz. *See* Notice of Oral *Ex Parte* Presentation*,* MRA Comments, WT Docket No. 02-55, at 12 (Oct. 23, 2002). But MRA's estimate is too flimsy of a basis on which to challenge the Commission's reconfiguration. First, the customers' channels were earlier moved out of the 800 MHz completely; therefore MRA had to replace its customers' handsets completely. But the reconfiguration under attack here requires simply retuning and consequently customer inconvenience here is not, as MRA claims, "exactly the same." *See* Int'rs' Br. 26 n.83. And as the FCC points out, we have consistently upheld its decisions that impose considerable costs on private actors in the regulated industry. *See, e.g.*, *Cmty. Television, Inc. v. FCC*, 216 F.3d 1133 (D.C. Cir. 2000) (upholding rules requiring all broadcasters to convert from analog to digital). The Commission reasonably decided not to compensate MRA for churn.

## E.

Finally MRA and Skitronics argue that the FCC improperly undervalued that part of the ESMR block of the reconfigured 800 MHz spectrum it granted Nextel under the Rebanding Decision. The FCC argues that even if MRA and Skitronics are correct that it undervalued the spectrum granted to Nextel, MRA and Skitronics have identified no injury traceable to the alleged overvaluation. Furthermore, assuming MRA and Skitronics prevailed on the improper valuation claim, Nextel would then be required to pay additional funds into the U.S. Treasury pursuant to the agreement between it and the Commission.[12] The

---

[12]Under the agreement, if the relocation costs Nextel must pay plus the value of its relinquished spectrum amounts to less than the value

*possibility* that MRA and Skitronics would receive the relief they seek—the cancellation of the Rebanding Decision—based on the theory that the Commission would revalue relocation costs so high that Nextel would withdraw its offer of compensation under the Consensus Plan is "purely speculative." Because MRA's and Skitronics' alleged injury is far from likely to be redressed by the Commission, they lack standing to press their claim. Resp't's Br. 42 (citing *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) ("[A] plaintiff's standing fails where it is purely speculative that a requested change in government policy will alter the behavior of regulated third parties.")).

In response MRA and Skitronics argue that the windfall Nextel receives due to the undervaluation will be of material assistance in Nextel's efforts to compete against them. Agency action that results in such a "skewed playing field" among competitors, they claim, is a sufficiently redressable injury to confer standing. Pet'rs' Reply Br. 19–20. While we have recognized competitor standing in the licensing context, the party seeking to establish standing on that basis "must demonstrate that it is 'a *direct* and *current* competitor whose bottom line may be adversely affected by the challenged government action.' " *KERM, Inc. v. FCC*, 353 F.3d 57, 60 (D.C. Cir. 2004) (quoting *New World Radio v. FCC*, 294 F.3d 164, 170) (D.C. Cir. 2002)) (emphases in *New World*). In *KERM, Inc.* we concluded that because KERM did not present evidence that the FCC's failure to take enforcement action against its competitor KAYH caused it loss such as "lost advertising revenues for KERM or otherwise adverse[] [effects

---

of both the replacement 1.9 GHz spectrum and the ESMR spectrum it receives under the Consensus Plan, it must pay the difference into the U.S. Treasury. *See* Rebanding Decision ¶ 34.

on] KERM's financial interests," it could not establish standing on the basis of competitive injury. *Id.* at 61. KERM instead "vaguely assert[ed] only that it competes with KAYH and that its own radio stations serve much of the same audience as KAYH. Such [b]are allegations are insufficient . . . to establish a petitioner's standing to seek judicial review of administrative action." *Id.* (quotation marks omitted) (alterations in original) (quoting *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002)).

The FCC claims that "it does not matter that MRA may compete with Nextel in some minor way," emphasizing that "Nextel operates on a nationwide basis, not just in the 2 or 3 markets where MRA and Skitronics have operations," Resp't's Br. 42. Nevertheless, because Nextel operates in some of the same markets, the requirement that Nextel be a "direct" and "current" competitor of MRA and Skitronics is likely met. MRA and Skitronics lack competitor standing, however, because they have failed to make a concrete showing that they are likely to suffer financial injury. Claiming the regulatory action creates a "skewed playing field," as MRA and Skitronics assert, is not enough; that claim is a "bare assertion" of competition of the type we found insufficient in *KERM, Inc. Cf. Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 152 (1970) (agency rule allowing banks to sell data processing services interfered with existing contracts held by data processing company petitioner which could therefore show more than that rule's application "might entail" "some future loss of profits"). Accordingly, MRA and Skitronics are without competitor standing to bring their valuation claim.

For the foregoing reasons, MRA's and Skitronics' petition for review of the Federal Communication Commission's Rebanding Decision and Reconsideration Order is denied.

*So ordered.*