RANDOLPH, Senior Circuit Judge,
dissenting:
I do not agree that EPA changed its position. And I do not agree that if EPA had changed its position, its new rule would violate the law against retroactive regulations.
EPA never stated, not once, that a company’s inter-pollutant transfers would permanently and forever alter the company’s baselines for these pollutants. EPA’s 2003 regulations said nothing of the sort. In fact, the regulations indicated otherwise. The only “permanent” baseline transfers EPA recognized were transfers from one company to another. EPA’s preamble to its 2003 regulations defined a “permanent transfer” as “a lasting shift of some quantity of a company’s allowances to another company.” 68 Fed.Reg. at 2835 (emphasis added). This passage should have alerted all affected parties that there was no similar option for transfers within one company, a position reflected in the regulations themselves. Under 40 C.F.R. § 82.23(d) (2003), a “person receiving a permanent transfer of baseline production allowances ... will be the person who has their baseline allowances adjusted in accordance with phaseout schedules in this section.” As the government argues, this provision contemplates inter-company transfers for the simple reason that “there would be no reason to identify which party receives the baseline adjustment if it was a one-party transaction.” EPA Br. at 55.
The majority never directly confronts the preamble and § 82.23(d). Instead, we are offered two indirect responses. The first is that if EPA had never authorized “permanent” inter-pollutant transfers, EPA’s proposal to incorporate those previ *11 ous changes into the 2010 baselines “would make little sense.” Maj. Op. at 9. In fact, the opposite is true. If EPA had authorized and approved transfers that permanently and forever altered the petitioners’ baselines, the proposal to allocate allowances “with or without” considering those transfers would be nonsensical.
The majority’s second response relies on EPA’s standard transfer form. But the completed form, together with an agency official’s approval of the transfer, signified only that EPA recognized a transaction known as a “baseline inter-pollutant transfer.” Nowhere did the EPA form address the effective duration of the transaction. The only correspondence to use the word “permanent” in connection with these trades specifically noted that it “should not be interpreted to signal a particular course of action for development of HCFC allowances for 2010-2014.”
Petitioners nevertheless insist that EPA led them to believe that their inter-pollutant transfers would permanently adjust their baselines. As to petitioner Solvay, this claim is demonstrably false. Each of Solvay’s 2008 transfer requests reads: “[Tjhis transfer is for Baseline Year Allowances and therefore is being done on a permanent basis (ie. multi-year transfer for 2008 and 2009).” In other words, Solvay believed that a baseline inter-pollutant transfer was “permanent” only in the sense of lasting beyond the current year and applying to the remainder of the step-down period (2008 and 2009 at the time of the request). Clearly, whatever statements EPA made did not convey to Solvay that the transfers were “permanent” in the sense petitioners now urge. Thus the only evidence of how the regulated parties actually interpreted the disputed terminology shows Solvay interpreting “baseline inter-pollutant transfer” to mean what EPA now says it meant.
Instead of relying on Solvay’s actual transfer requests, the majority locates in EPA’s transfer form an unwritten implication that if baseline inter-company transfers applied beyond the end of the regulatory period, so did baseline inter-pollutant transfers. No reasonable company would have viewed the form’s arrangement of check-boxes as implying any such thing. Still less could a company reasonably base its investment decisions on such flimsy evidence. EPA’s failure to interpret its form in the way the majority interprets it hardly amounts to arbitrary action. The majority owes EPA deference for its interpretation of its form, but it gives the agency none. See Global Crossing Telecomms., Inc. v. FCC, 259 F.3d 740, 746 (D.C.Cir.2001); Wyoming Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 53 (D.C.Cir.1999).
The interpretive choice reflected in the 2003 regulations and the one EPA expressly adopted in the latest regulations was utterly predictable. If regulated parties were permitted to make permanent shifts in allowances between pollutants, the transactions would give rise to potential manipulation. Arkema attempted to convert permanently its HCFC-142b baseline allowances into HCFC-22 baseline allowances just before its HCFC-142b account was reduced (or “stepped down”) by 99.6 percent. If Arkema had succeeded, not only would it have increased its total allowances but, going forward, it would have been able to convert its new HCFC-22 allowances back into HCFC-142b allowances on an annual basis. This maneuver would have allowed Arkema to continue producing HCFC-142b while avoiding the 99.6 percent stepdown. EPA, recognizing that it had never promised to make these types of transactions available, expressly made the transactions unavailable.
*12 For these reasons, I do not believe the 2010 regulations altered the policy embodied in the 2003 regulations. As a result, there is no retroactivity problem. Cf. Health Ins. Ass’n of Am., Inc. v. Shalala, 23 F.3d 412, 424 (D.C.Cir.1994).
But even if EPA changed its position, the 2010 regulations barring future production and consumption of hydrochlorofluorocarbons based on previous inter-pollutant transfers is not retroactive. A rule is not retroactive solely because it “upsets expectations based in prior law.” Landgraf v. USI Film Prods., 511 U.S. 244, 269, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Rather, a retroactive rule is one that “takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past....” Id. (quoting Soc’y for the Propagation of the Gospel v. Wheeler, 22 F. Cas. 756, 767 (C.C.D.N.H.1814)); accord Ass’n of Accredited Cosmetology Sch. v. Alexander, 979 F.2d 859, 864 (D.C.Cir.1992).
The majority relies primarily on cases in which new regulations imposed liability on conduct that did not give rise to liability at the time it occurred. See, e.g., Nat’l Mining Ass’n v. U.S. Dep’t of the Interior, 177 F.3d 1, 8 (D.C.Cir.1999); Health Ins. Ass’n, 23 F.3d at 425. These cases all recognize the “unfairness of imposing new burdens on persons after the fact.” Landgraf 511 U.S. at 270, 114 S.Ct. 1483. But when no new liability is created, it is not enough that a party relied on existing regulations in the hope that the law would remain unchanged. See, e.g., Mobile Relay Assocs. v. FCC, 457 F.3d 1, 11 (D.C.Cir.2006); DirecTV, Inc. v. FCC, 110 F.3d 816, 826 (D.C.Cir.1997); Ass’n of Accredited Cosmetology Sch., 979 F.2d at 864. This is why a new regulation that merely “affects a regulated entity’s investment made in reliance on the regulatory status quo” will be upheld as long as it is reasonable. Mobile Relay Assocs., 457 F.3d at 11.
EPA’s 2010 regulations impose no new liability or duty on petitioners. They do not invalidate the effectiveness of the inter-pollutant transfers for past years or impose liability on the companies for exercising the allowances gained through them. For the 2010 regulations to be considered retroactive, they must have taken away some vested right petitioners possessed. But these companies had no vested rights. The 2003 regulations established allowances only for the years 2003 to 2009. 40 C.F.R. § 82.16 (2003). The preamble to the regulations made clear that EPA would award allowances by notice-and-comment rulemaking for years after 2009 and that it was merely “likely” that EPA would do so by allotting a percentage of the baselines established by the 2003 regulation. 68 Fed.Reg. at 2823. Even if the inter-pollutant transfers had been recognized as carrying over to years after 2009, that baseline would not vest these companies with the right to produce or consume any particular quantity of hydrochlorofluorocarbons — EPA would still have to grant allowances as a percentage of that baseline.
The 2010 regulations may have frustrated the petitioners’ expectations that they would be able to produce and consume certain quantities of hydrochlorofluorocarbons. But like the regulation upheld in Mobile Relay Associates, the effect of the regulation is purely prospective. “To conclude otherwise would hamstring not only [EPA] in its [hydrochlorofluorocarbon] management, but also any agency whose decision affects the financial expectations of regulated entities.” Mobile Relay Assocs., 457 F.3d at 11.
The majority recognizes that EPA adequately explained its decision in the 2010 *13 regulations not to recognize permanent inter-pollutant transfers. Maj. Op. at 8-9. Because those regulations do not impair vested rights, create new obligations, impose new duties, or attach new disabilities based on past transactions, the regulations are not impermissibly retroactive and should be upheld.