**TELEDESIC LLC, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

**Fixed Wireless Communications Coalition and WinStar Communications, Inc., Intervenors.**

**No. 00-1466.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 5, 2001.

Decided Dec. 28, 2001.

Mark A. Grannis argued the cause for petitioner. With him on the briefs were Scott Blake Harris and Timothy J. Simeone.

C. Grey Pash, Jr., Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were Daniel M. Armstrong, Associate General Counsel, John M. Nannes, Acting Assistant Attorney General, United States Department of Justice, Robert B. Nicholson, and Adam D. Hirsh, Attorneys. John E. Ingle, Deputy Associate General Counsel, Federal Communications Commission, Thomas E. Chandler, and James M. Carr, Counsel, and Christopher J. Sprigman, Attorney, United States Department of Justice, entered appearances.

Joseph M. Sandri, Jr., Barry J. Ohlson, Leonard R. Raish, Mitchell Lazarus and Liliana E. Ward were on the brief for intervenors.

Before: EDWARDS and RANDOLPH, Circuit Judges, and WILLIAMS, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

Teledesic LLC ("Teledesic") petitions for review of the Federal Communications Commission's ("FCC" or "Commission") *Report and Order* governing the reallocation of a band of radio spectrum previously shared by satellite and traditional terrestrial spectrum users. *See In re Redesignation of the 17.7-19.7 GHz Frequency Band, Report and Order,* 15 F.C.C.R. 13,-430 (2000) ("*Report and Order*"). The *Report and Order* set forth rules allocating one part of the band to satellite users and another part to terrestrial users. Teledesic, a company that plans to build a global telecommunications network using satellite technology, objects to the new rules requiring satellite operators to pay the relocation costs incurred by terrestrial operators during the initial reallocation period.

Just before oral argument in this case, the FCC revised the new rules so as to accede to the demands of Teledesic with respect to two issues. Teledesic's challenges on these two issues are therefore moot. With respect to the remaining issues, we find no merit in Teledesic's challenges. The new rules are founded on the FCC's goals of protecting existing terrestrial spectrum users while facilitating the growth of new, comprehensive satellite networks. The agency's goals and the regulatory means used to implement them are both permissible and reasonable.

Accordingly, we hereby dismiss the moot challenges and otherwise deny Teledesic's petition for review.

## I. BACKGROUND

■ Among its many responsibilities, the FCC is charged with regulating and overseeing radio spectrum. *See* 47 U.S.C. §§ 151 (Supp. V 1999) (creating the FCC for the purpose of regulating commerce in communication by wire and radio), 303 (1994 & Supp. V 1999) (authorizing the Commission, *inter alia,* to assign station frequencies, issue regulations to avoid interference between stations, study new uses for radio, and encourage broader and more effective use of radio in the public interest). This responsibility has become more challenging in recent years due to the growth of new telecommunications technologies. This case concerns the FCC's efforts to reallocate one portion of the spectrum to accommodate an ascendant and promising technology: satellite telecommunications networks.

Prior to the Commission's *Report and Order,* the band of spectrum from 17.7 to 19.7 (known as the "18 GHz band") was allocated to two broad groups of telecommunications users. Terrestrial fixed services (also known as "FS") operate by connecting one fixed location with one or more other fixed locations. *See* 47 C.F.R. § 2.1(c) (2000). They serve many functions, including remote monitoring of gas and petroleum pipelines, public safety communications, railroad communications, public utilities, and high speed Internet access. *See* Br. for Respondents at 3; Br. for Intervenors at 1-2. The FCC estimates that approximately 179,000 terrestrial FS links operate in the 18 GHz band, and this number will grow as services move up from more congested lower bands. *Report and Order,* 15 F.C.C.R. at 13,436 ¶ 11.

FS users share the 18 GHz band on a co-primary basis with fixed satellite services (or FSS), which connect fixed locations by satellite. *See* 47 C.F.R. § 2.1(c). These services utilize many earth stations that communicate with one or more space stations. Satellite technology has the potential to provide global Internet access, two-way digital communications, video conferencing, telemedicine, and residential voice and data communications services. *In re Redesignation of the 17.7-19.7 GHz Frequency Band, Notice of Proposed Rulemaking,* 13 F.C.C.R. 19,923, 19,929 ¶ 9 (1998) ("*NPRM*"). The FCC expects these services to expand dramatically in the next decade. *Id.* Currently, the FCC reports that no non-governmental satellite earth stations operate in the 18 GHz band, but Teledesic has been granted a license, and a number of other companies have also applied for licenses. Br. for Respondent at 3 n.1. Teledesic plans to deploy a large number of earth stations to support a global Internet telecommunications network. *See* Br. for Petitioner, Corporate Disclosure Statement at 1.

Establishing so many satellite stations would be difficult under the co-primary system, because the FS stations currently occupying the band can cause harmful interference to the new satellite systems if the two are located too close together on the spectrum. *See In re Redesignation of the 17.7-19.7 GHz Frequency Band, Comments of Teledesic LLC,* IB Docket No. 98-172 (Nov. 19, 1998), at 3-4 ("Teledesic Comments"), *reprinted in* Joint Appendix ("J.A.") 150-51. Under the co-primary system, all users must coordinate with one another to prevent such interference. *See* 47 C.F.R. §§ 25.203 (setting forth coordination procedures for selection of sites and frequencies), 101.103(d) (setting forth frequency coordination procedures). By 1998, satellite companies had advised the

Commission about the "ubiquitous" nature of the networks they planned to construct. *NPRM,* 13 F.C.C.R. at 19,933 ¶ 18. They urged the Commission to adopt "blanket licensing" for satellite systems, in which a large number of stations would be authorized at once without the licensee having to specify each station's individual location. *Id.* The companies also advised the FCC that it would be difficult to construct ubiquitous satellite networks if the satellites had to share band space on a co-primary basis with terrestrial users. *Id.*

The Commission responded with a Notice of Proposed Rulemaking proposing changes designed to make more efficient use of the 18 GHz band in light of the impending widespread deployment of satellite earth stations. *Id.* at 19,925 ¶ 1. The Commission found that satellite operators planned to deploy "potentially millions of small antenna earth stations," and expressed concern about "the feasibility of sharing between terrestrial fixed service and ubiquitously deployed FSS earth stations." *Id.* It agreed with the satellite companies that blanket licensing would probably be necessary to keep up with the large numbers of satellite earth stations in the works. *Id.* at 19,933 ¶ 19. In light of these concerns, the Commission proposed segmenting the band into subsections dedicated to satellite and terrestrial stations respectively. *Id.*

Under the proposed plan, FS services would lose their co-primary status in portions of the band, but the Commission proposed to grandfather FS services already operating in those sections. *Id.* at 19,941-42 ¶ 40. One reason for this proposal was that, while there were not yet any commercial satellite systems operating in the band, there were thousands of existing FS operators there, and the FCC wished to protect the investment in those services. *Id.* Another reason was the

Commission's tentative conclusion that satellite operators would be able to design their networks to avoid reception of harmful interference from existing FS users. *Id.*

The FCC further concluded that some existing terrestrial facilities would probably have to be relocated from one frequency to another, and it solicited comments about the best way to accomplish this relocation. *Id.* at 19,942 ¶ 41. The Commission noted that it had addressed the same question in earlier proceedings, and it asked commenters to discuss whether the principles adopted in the earlier proceedings should apply here. *Id.* at 19,942-43 ¶ 41 & nn.65-66 (citing the *"Emerging Technologies"* proceedings: *In re Redevelopment of Spectrum to Encourage Innovation in the Use of New Telecommunications Technologies, First Report and Order and Third Notice of Proposed Rule Making,* 7 F.C.C.R. 6886 (1992); *Second Report and Order,* 8 F.C.C.R. 6495 (1993); *Third Report and Order and Memorandum Opinion and Order,* 8 F.C.C.R. 6589 (1993); *Memorandum Opinion and Order,* 9 F.C.C.R.1943 (1994); *Second Memorandum Opinion and Order,* 9 F.C.C.R. 7797 (1994), as well as the *"Mobile Satellite Service at 2 GHz"* allocation proceeding: *In re Amendment of Section 2.106 of the Commission's Rules to Allocate Spectrum at 2 GHz for Use by the Mobile-Satellite Service, First Report and Order and Further Notice of Proposed Rule Making,* 12 F.C.C.R. 7388, 7396-7404, 7414-21 (1997)).

The Commission received comments from interested parties, including Teledesic and FS users. The latter group included the Fixed Wireless Communications Coalition and Winstar Communications, Inc., the intervenors before this court, which represent the interests of FS users.

In general, Teledesic "strongly support[ed]" the proposal to segment the 18 GHz band, but expressed concern about the delay that would be caused by grandfathering existing FS users. Teledesic Comments at ii, *reprinted in* J.A. 146. Teledesic asked the FCC to adopt "blanket licensing" of satellite earth stations. *Id.* at 8-11, *reprinted in* J.A. 155-58. It urged the FCC ·not to require satellite users to pay to relocate FS stations to "comparable facilities," as had been required in the *Emerging Technologies* rules, and requested that the FCC adopt principles of "cost mitigation." *Id.* at 15-21, *reprinted in* J.A. 162-68.

The FCC issued its *Report and Order* on June 22, 2000. The *Report and Order* reflect the FCC's conclusion that separating terrestrial users from satellite stations will serve the public interest. *Report and Order*, 15 F.C.C.R. at 13,431-32 ¶ 2. The *Report and Order* articulate a policy of protecting existing FS operations "to the maximum extent possible," while providing for the growth of both satellite and terrestrial services. *Id.* To facilitate this policy, the *Report and Order* designate, broadly, one subset of the band in which FS users will be primary, and another, larger subset for satellite users. *See id.* at 13,432 ¶ 4, 13,443-56 ¶ ¶ 28-54. The *Report and Order* also authorize blanket licensing for certain satellite earth stations. *Id.* at 13,-470-75 ¶ ¶ 85-95.

Rather than permanently grandfathering existing FS users, the *Report and Order* allow FS stations in the portion of the band that will be reallocated for satellite use to retain co-primary status for 10 years. Satellite operators wishing to evict terrestrial users must first negotiate with them. This negotiation period begins with the adoption of the *Report and Order* and lasts for two years in most cases, and for three years for terrestrial public safety

services. 47 C.F.R. § 101.85(c). A terrestrial user contacted by a satellite user may not refuse to negotiate and all parties are required to negotiate in good faith. *Id.* § 101.89(b). In deciding whether the parties have negotiated in good faith, the FCC will consider factors including whether the satellite has made a bona fide offer of relocation and whether, if the terrestrial user demanded a premium, the premium was proportionate to the cost of providing comparable facilities. *Id.* "Comparable facilities" are defined by the regulations in terms of "throughput" or capacity, reliability, and operating costs. *Id.* § 101.89(d). For example, if digital facilities are replaced with digital facilities, the satellite service must provide the terrestrial user with equivalent data loading bits per second. *Id.* § 101.89(d)(1). Satellite users must also compensate FS licensees for any "increased recurring costs associated with the replacement facilities" for five years after relocation. *Id.* § 101.89(d)(3).

If no agreement is reached during the negotiation period, then 47 C.F.R. § 101.91 allows the satellite service to displace the FS user involuntarily. If involuntary displacement occurs during the 10-year transition period, however, the satellite user must pay all costs of moving the terrestrial user to replacement facilities, complete all activities necessary for implementing the relocation, build the new system, and test the new system. 47 C.F.R. § 101.91(a). The replacement facilities must be at least equivalent, in terms of throughput, reliability, and operating costs, as the facilities from which the FS user is evicted. *Id.* § 101.91(b). At the end of the 10-year transition period, satellite operators will be able to evict terrestrial incumbents without having to pay their relocation costs. 47 C.F.R. § 101.95(a). The initial, unrevised *Report and Order* exempted a small subset of the band (19.26-19.3 GHz) from the sunset provisions. *Report and Order*, 15

F.C.C.R. at 13,464 ¶ 69; 47 C.F.R. § 101.95. The initial, unrevised *Report and Order* also provided that low-power stations could continue to operate on a primary basis. *Report and Order*, 15 F.C.C.R. at 13,457 ¶ 56.

Teledesic petitioned for review, challenging the relocation rules and the Commission's failure to adopt its alternative proposals. Teledesic also challenged the exception for low-power stations and the exemption of stations in the 19.26-19.3 GHz band from the sunset provisions. The FCC moved to hold the case in abeyance, because some parties to the proceeding before the Commission had petitioned for reconsideration of the *Report and Order*. Teledesic was not among the parties seeking reconsideration. A panel of this court denied the FCC's motion to hold these proceedings in abeyance, *see Teledesic LLC v. FCC*, 2001 WL 79748, No. 00-1466 (D.C.Cir. Jan. 31, 2001) (Order), and oral argument was scheduled for November 5, 2001.

Less than a week before oral argument, the Commission issued a *Reconsideration Order*. *See In re Redesignation of the 17.7-19.7 GHz Frequency Band, First Order on Reconsideration*, IB Docket No. 98-172 (Nov. 1, 2001) ("*Reconsideration Order*"). In the *Reconsideration Order*, the FCC addressed, *sua sponte*, some of the concerns Teledesic had raised in its petition and briefs to this court. Specifically, the Commission decided that low-power stations should be subject to the same relocation regime as all other FS stations. *Id.* at 16-20 ¶¶ 32-41. The Commission also decided not to exempt stations in the 19.26-19.3 subset from the sunset provisions. *Id.* at 12-14 ¶¶ 23-25. The Commission stated that it had authority to address *sua sponte* the issues that Teledesic had chosen to raise before this court, regardless of whether any petitions pend-

ing before the Commission had raised those issues. *Id.* at 11 ¶ 20 & n. 66 (citing *Cent. Fla. Enters., Inc. v. FCC*, 598 F.2d 37, 48 n. 51 (D.C.Cir.1978)).

## II. DISCUSSION

### A. *The Order under Review is Final.*

■ Before turning to the merits of Teledesic's challenges, we consider whether the *Report and Order* are final and reviewable by this court. This court has jurisdiction to review final orders of the FCC made reviewable under 47 U.S.C. § 402(a). 28 U.S.C. § 2342(1) (1994). Section 402(a) governs proceedings to set aside or annul FCC orders except those specifically listed as being appealable under § 402(b), relating to particular applications. Teledesic's petition falls under § 402(a), and is therefore reviewable.

■ Teledesic was within its rights to seek review in this court without first petitioning for reconsideration by the FCC. *See* 47 U.S.C. § 405(a) (1994) (providing that the filing of a petition for reconsideration shall not be a condition precedent to judicial review of an FCC order unless the party seeking review was not a party to the initial proceedings or relies on questions of law or fact on which the Commission has not had an opportunity to pass). Teledesic was a party to the initial proceeding before the Commission, and the Commission addressed Teledesic's arguments regarding the relocation rules. Therefore, Teledesic had standing to seek judicial review of the *Report and Order*.

■ The fact that parties other than Teledesic petitioned the FCC for reconsideration of the *Report and Order* does not deprive the court of jurisdiction over Teledesic's petition. *See Wrather–Alvarez Broad., Inc. v. FCC*, 248 F.2d 646, 649 (D.C.Cir.1957) (noting that because parties to FCC proceedings "have their choice

whether to seek relief from Commission action from the Commission itself or from the court ... it may happen ... that one party will choose one tribunal and another party the other"). In such cases, we often hold a petition for review in abeyance pending the FCC's further proceedings, see id., but this practice is not an iron-clad rule, see, e.g., MCI Telecomms. Corp. v. FCC, 143 F.3d 606, 608 (D.C.Cir.1998) (determining that prudential considerations militated in favor of resolving the petitions for review even though parties other than the petitioners had filed petitions for reconsideration before the FCC). It is likewise true that it does not matter whether petitions are filed to challenge portions of the Reconsideration Order. Any such challenges do not bear on our resolution of Teledesic's challenges to the disputed Report and Order, because the Reconsideration Order is not subject to review in this case. What is important here is that the Report and Order were final and appealable as to Teledesic.

The court decided not to hold in abeyance Teledesic's petition for review of the Report and Order, even though other parties had petitioned the Commission for reconsideration. And our jurisdiction over Teledesic's petition was not lost when the Commission elected to issue its Reconsideration Order mere days before oral argument. The FCC claims that, under Central Florida Enterprises, Inc. v. FCC, 598 F.2d 37, 48 n. 51 (D.C.Cir.1978), the agency had authority to address sua sponte in its Reconsideration Order several of the issues that were pending before this court. In other words, the FCC contends that it had the discretion to reconsider certain of the issues raised by Teledesic and then issue a Reconsideration Order even though Teledesic had not filed a petition for reconsideration and had opted instead to seek judicial review. We need not decide this question.

■ Notwithstanding the Reconsideration Order, the Commission's Report and Order of June 22, 2000, are the only matters under review in this proceeding. Thus, in addressing Teledesic's claims, we rely only on the agency's positions set forth in the Report and Order, not on the Commission's subsequent elaborations in the Reconsideration Order. We note, however, that, apart from the FCC's decision to accede to Teledesic's demands on two issues, the Reconsideration Order merely expands upon the rationales for the relocation rules contained in the original Report and Order.

Although this petition for review involves only the June 22, 2000 Report and Order, we cannot ignore the fact that two of Teledesic's challenges have evaporated in light of the Commission's change of policy as expressed in its Reconsideration Order. See Reconsideration Order at 12-14 ¶¶ 23-25 (making terrestrial stations in the 19.26-19.3 GHz subset of the band subject to the sunset date), 16-20 ¶¶ 32-41 (making low-power terrestrial stations in the 18 GHz band subject to the relocation rules). At oral argument, the Commission gave official notice to the court via the Reconsideration Order that the rules regarding (1) the 19.26-19.3 GHz subset of the band and (2) low-power terrestrial stations were no longer in effect. Counsel for Teledesic assured the court that the Reconsideration Order had fully addressed Teledesic's concerns on these matters. Neither side sought to pursue the issues. It is therefore clear that the issues concerning low-power stations and the 19.26-19.3 GHz subset are moot. Accordingly, we turn to Teledesic's remaining challenges.

**B. The FCC's Relocation Rules are Reasonable.**

1. *Standard of Review*

We must uphold the FCC's actions unless they are arbitrary, capricious, an abuse of discretion, or otherwise unlawful. 5 U.S.C. § 706(2)(A) (1994). Pursuant to this standard, we look to determine whether the Commission has "articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). The court must ensure that the agency has given reasoned consideration to all of the relevant facts and issues. *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C.Cir. 1970).

While agreeing on these basic principles, the parties nonetheless dispute the degree of deference that is warranted. The Commission argues that review must be especially limited because the *Report and Order* concern matters within its area of expertise that involve predictions "at the frontiers of science." Br. for Respondents at 15 (quoting *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)). It further argues that the spectrum reallocation rules at issue are just the sort of technical rules within its area of expertise that traditionally have merited a heightened degree of deference. *Id.* at 16 (citing *Aeronautical Radio, Inc. v. FCC*, 928 F.2d 428, 443-45 (D.C.Cir. 1991) (upholding an FCC decision on allocation because it was a predictive judgment of the type historically left to agency discretion); *Nat'l Ass'n of Broadcasters v. FCC*, 740 F.2d 1190, 1209-14 (D.C.Cir. 1984) (upholding an FCC decision on FS relocation given that the Commission acted against an evolving technological and fac-

tual background)). Teledesic counters that it objects not to the Commission's scientific predictions, but to its system of compensating displaced terrestrial operators. Teledesic argues that the FCC's economic compensation scheme is not entitled to the same deference as an order dealing with purely technical matters.

In our view, the parties' dispute involves a fundamental disagreement over the policy goals underlying spectrum reallocation. The problem presented by the 18 GHz band is not merely one of economics. The Commission correctly conceives of its role in prophetic and managerial terms: it must predict the effect and growth rate of technological newcomers on the spectrum, while striking a balance between protecting valuable existing uses and making room for these sweeping new technologies. *Report and Order*, 15 F.C.C.R. at 13,43133 ¶¶ 1-2, 4-5. In striking this balance, the Commission has relied on its judgments about the importance of old, terrestrial services, as well as the potential value to society of new, emerging satellite systems. Its decisions about how best to strike this balance thus involve both technology and economics. The Commission is therefore entitled to the deference traditionally accorded decisions regarding spectrum management. *See Telocator Network of Am. v. FCC*, 691 F.2d 525, 538 (D.C.Cir.1982) (finding that when it is fostering innovative methods of exploiting the spectrum, the Commission "functions as a policymaker and, inevitably, a seer – roles in which it will be accorded the greatest deference by a reviewing court").

## 2. *The Challenges to the FCC's Relocation Rules*

Teledesic argues that the rules governing the relocation of terrestrial services are arbitrary and capricious because they force satellite operators to confer windfalls

on terrestrial services by paying for and building "comparable facilities." It claims that, because many terrestrial operators currently use aging equipment, satellite operators will end up subsidizing the terrestrial operators' upgrades to new equipment. Teledesic characterizes this result as one of systematic overcompensation. Br. for Petitioner at 27. In its comments to the Commission, Teledesic urged the agency to require that satellite operators compensate displaced FS users only for the unamortized "book value" of their old equipment. It now accuses the Commission of rejecting this proposal without articulating a satisfactory reason for doing so.

Teledesic's contentions fail because the Commission adequately explained both the rationale underlying its chosen approach, as well as its reasons for rejecting Teledesic's proposed alternative. First, as noted above, one of the Commission's goals was to protect existing terrestrial services. *Report and Order*, 15 F.C.C.R. at 13,431-32 ¶ 2. If the Commission only required FSS users to pay terrestrial users for the book value of their equipment, FS users that were unable to afford replacement equipment might be put out of business when displaced. Second, in addressing Teledesic's proposal, the Commission reaffirmed its policy of placing the cost of involuntary relocation to comparable facilities on new entrants. *Id.* at 13,468 ¶ 78. According to the FCC, the justification for this policy is that existing users must be able to obtain replacement equipment at no cost in order to continue to provide service with a minimum of disruption. *Id.*; *In re Amendment of Section 2.106 of the Commission's Rules to Allocate Spectrum at 2 GHz for Use by the Mobile-Satellite Service, Second Report and Order and Second Memorandum Opinion and Order*, 15 F.C.C.R.

12,315, 12,352 ¶ 109 (2000) ("*2 GHz MSS Relocation Order*") (reiterating in a more recent decision that the Commission "consider[s] it essential that the process not disrupt the communications services provided by the existing ... operations") (citing the *Emerging Technologies* proceeding, *In re Redevelopment of Spectrum to Encourage Innovation in the Use of New Telecommunications Technologies, Third Report and Order and Memorandum Opinion and Order*, 8 F.C.C.R. 6589, 6594 ¶ 13 (1993)).

These policy goals are reasonable and do not, on their face, result in windfalls for incumbents. The Commission's objective is simple: ensure that incumbent terrestrial users will be able to continue operating even if they are forced by satellite users to relocate. Teledesic expresses concern that the "comparable facilities" standard will result in incumbents replacing their aging facilities with unduly expensive, state-of-the-art equipment at the expense of satellite companies. "Comparable facilities," however, does not mean that terrestrial users will be able to insist on top-of-the-line replacement facilities. Rather, satellite operators will have to ensure that the replacement facilities are equivalent to the existing FS facilities with respect to throughput, reliability, and operating costs, as explained in the regulations. *See* 47 C.F.R. §§ 101.89(d), 101.91(b). If the satellite operator can meet the standard by retuning or repairing old equipment, it need not outfit the FS user with new equipment. Even if new facilities are necessary to meet the standard, this does not necessarily mean that FS users will be able to demand the newest and most expensive equipment if less new equipment will meet the standard. The stated goal of the standard is not to provide free upgrades to terrestrial users, but rather to "ensure a seamless handoff" and a smooth

transition to the new band segmentation regime. *Id.* at § 101.91(c).

The Commission's current approach to the relocation of incumbents is not new. It was adopted first in the *Emerging Technologies* rules and, after the instant order was issued, in another relocation proceeding. *See 2 GHz MSS Relocation Order,* 15 F.C.C.R. at 12,351-52 ¶¶ 108-10. Indeed, this court has approved aspects of a similar relocation scheme in the *Emerging Technologies* context. *See Ass'n of Pub.-Safety Communications Officials-Int'l, Inc. v. FCC,* 76 F.3d 395, 397, 400 (D.C.Cir.1996) (upholding the elimination of an exemption for public safety incumbents from a relocation regime in which emerging technology licensees would pay all costs associated with relocating incumbents to comparable facilities). Moreover, the Commission has adopted similar relocation schemes in other contexts. *See Small Bus. in Telecomms. v. FCC,* 251 F.3d 1015, 1017, 1026 (D.C.Cir.2001) (denying in part and dismissing in part petition for review of relocation regime in which displaced incumbents would be given comparable facilities to ensure a seamless transition).

Because the Commission's policy in this instance is consistent with its overall approach to new technologies, it argues that it was not required to give as extensive a justification as it would have had it unveiled the policy for the first time here. We agree. *See Hall v. McLaughlin,* 864 F.2d 868, 872 (D.C.Cir.1989) (holding that where an agency is following established policy, the need for a comprehensive statement of its rationale is less pressing). Like the *Emerging Technologies* proceedings, this *Report and Order* involve new technologies displacing existing users and being forced to pay those existing users to relocate to comparable facilities. In *Emerging Technologies,* the FCC acknowl-

edged that incumbents that are forced to relocate involuntarily will not incur any costs as a result of the forced relocation, and may even benefit in some instances if their aging equipment is replaced with state-of-the-art technology. *Third Report and Order and Memorandum Opinion and Order,* 8 F.C.C.R. 6589, 6595 ¶ 16 (1993). The Commission viewed such a result as the legitimate byproduct of a process whereby important terrestrial services are uprooted against their will to accommodate newer technologies. The Commission's consistent policy has been to prevent new spectrum users from leaving displaced incumbents with a sum of money too small to allow them to resume their operations at a new location. *See 2 GHz MSS Relocation Order,* 15 F.C.C.R. at 12,-352 ¶ 109 (expressing the Commission's view, dating from the *Emerging Technologies* proceeding, that existing operations should not be disrupted during the transition to emerging technologies).

Teledesic objects to the FCC's reliance on *Emerging Technologies,* arguing that, because the Commission readily acknowledged some differences between this case and *Emerging Technologies,* the Commission must start from scratch in this case. There is only one notable difference between *Emerging Technologies* and this case: *Emerging Technologies* involved an entirely new service displacing incumbent licensees, while, in this case, satellite and terrestrial users already coexisted in the 18 GHz band on a co-primary basis. *Report and Order,* 15 F.C.C.R. at 13,468 ¶¶ 79-80. This is a difference without significance, however. Teledesic and other companies plan to launch comprehensive *new* satellite systems involving millions of earth stations that will be licensed on a blanket basis. To accommodate these new systems, existing terrestrial users must be displaced like the incumbents in *Emerging Technologies.* The compensatory and pres-

ervationist justifications for the "comparable facilities" requirement therefore apply equally in this case, and it was legitimate for the Commission to explain its choices in part by reference to the earlier proceeding.

Teledesic's contention that the Commission impermissibly failed to consider its "cost mitigation" proposals is similarly misplaced. Teledesic accuses the FCC of failing to consider how to encourage reasonable cooperation by terrestrial incumbents in the relocation process. Br. for Petitioner at 34. One of Teledesic's proposals is that no compensation should be paid for equipment replaced after the Commission issued its *NPRM*, and the other is that FS licensees who renew their grandfathered licenses should receive less compensation than other FS licensees. Teledesic Comments at 20-21, *reprinted at* J.A. 167-68. Teledesic's claim is not supported by the record, which reflects that the Commission was extremely concerned with providing incentives to incumbents to relocate. The Commission encouraged them to do so by issuing rules that initially reward relocation and then sunset after 10 years. Terrestrial operators who have not relocated by that point will be penalized, while those that negotiate a deal expeditiously with a satellite company will receive the benefit of the "comparable facilities" standard. By contrast, Teledesic's proposals are aimed less at smoothing the way for reallocation than at minimizing its own costs, and they do not advance the FCC's goals of preserving terrestrial systems while ushering in new satellite networks. Because Teledesic's proposals are patently inconsistent with the Commission's well-explained goals, the Commission was not required to analyze each of those suggestions in detail.

### 3. *Safeguards*

Teledesic raises a legitimate concern over the possibility that terrestrial operators may hold out during negotiations in an attempt to extract payments from satellite users over and above the costs of relocating. The Commission anticipated this concern, however, and structured the new rules to protect against unreasonable bargaining by terrestrial operators.

Teledesic objects in particular to the provision in 47 C.F.R. § 101.89, which requires satellite users to negotiate with FS users for two (and sometimes three) years, during which time FS operators may seek "premium[s]." Teledesic's concern is that, by authorizing terrestrial operators to demand premiums, the rules give them a green light to demand unreasonable sums of money from the satellite companies, who have no choice but to accede or wait until the end of the two-year period. In response, the Commission points out that Teledesic's view of the rule is badly distorted, for it ignores the limitations that the rule places on the bargaining behavior of incumbents. The Commission is right.

The cited rule explicitly requires both parties to negotiate in good faith during the negotiation period. "Good faith" is measured, in part, by looking at whether the FS service has demanded a premium that is disproportionate to the cost of providing comparable facilities. 47 C.F.R. § 101.89(b)(2). Thus, rather than authorizing incumbents to demand inequitable windfalls, the rules explicitly forbid them from doing so. Moreover, an incumbent whose bargaining demands are challenged must justify its numbers against a regulatory standard. In other words, the demands must be reasonably related to the actual cost of relocating to an equivalent facility as defined in the regulations. This requirement prevents terrestrial users from attempting to gouge satellite compa-

nies that are required to negotiate with them.

A second safeguard exists in the form of time limits on negotiations. If a terrestrial operator holds out during the two to three year negotiation period, the satellite user may initiate involuntary relocation procedures pursuant to 47 C.F.R. § 101.91. An incumbent's incentive during the negotiation period, therefore, is to negotiate as advantageous a deal as possible before facing forced relocation. Once the negotiation period is over, incumbents still have an incentive to relocate before the sunset provisions kick in. After 10 years, incumbents will be forced to relocate without receiving *any* relocation payments. Because of these temporal limits on incumbents' expectations of relocation payments, the value of their addresses on the spectrum goes down over time. A satellite company will presumably be less willing to pay to relocate an incumbent the longer the latter holds out as the sunset date approaches. These safeguards provide adequate protection against unreasonable negotiation tactics.

### III. CONCLUSION

For the reasons cited above, we hereby dismiss the moot challenges and otherwise deny Teledesic's petition for review as meritless.

*So ordered.*