*245 KAVANAUGH, Circuit Judge,
concurring in part, concurring in the judgment in part, and dissenting in part.
To expand consumer access to broadband Internet services, increase competition against DSL and cable modem providers, and lower prices for consumers, the FCC adopted a rule to facilitate the use of electric power lines for broadband Internet access. The petitioner, an organization of amateur radio operators, has challenged this “Access Broadband Over Power Line Systems” rule. I agree with the majority opinion that the FCC’s rule complies with the Communications Act.
Applying the Administrative Procedure Act and our Portland Cement line of decisions, however, the majority opinion remands for the FCC to release redacted portions of certain FCC staff documents analyzing field tests of broadband over power lines. See Portland Cement Ass’n v. Ruckelshaus, 486 F.2d 375, 392-93 (D.C.Cir.1973). In light of our precedents, I concur in the judgment on this point; but I write separately because of concerns about our case law in this area.
Applying the State Farm principle, the majority opinion also remands for the FCC to further explain why it chose to use a certain measurement, or “extrapolation factor,” to estimate the interference that broadband over power lines will cause to licensed radio services. See Motor Vehicle Mfrs. Ass’n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). I respectfully dissent from that holding because I believe the FCC sufficiently explained its reasoning.
I therefore join Parts I, IIA, and IID of the majority opinion. I concur in the judgment as to Part IIB, and I dissent from Part IIC.
I
In issuing its rule, the FCC relied on various technical studies, including an NTIA report; the various interference studies filed in the record, including petitioner’s studies; and the unredacted portions of certain internal FCC staff studies. Amendment of Part 15 Regarding New Requirements and Measurement Guidelines for Access Broadband Over Power Line Systems, Mem. Op. and Order, 21 F.C.C.R. 9308, 9324-25 ¶47 (2006). The FCC publicly disclosed all those materials. But the Commission did not release certain redacted portions of the internal staff studies on which it relied. Id. Citing § 553 of the APA, petitioner says the FCC must release the redacted portions of the staff studies so that interested parties can comment on them and so the FCC, in turn, can consider those comments.
Petitioner’s argument would be unavailing if analyzed solely under the text of APA § 553. The APA requires only that an agency provide public notice and a com *246 ment period before the agency issues a rule. See 5 U.S.C. § 553. The notice must include “the terms or substance of the proposed rule or a description of the subjects and issues involved.” § 553(b)(3) (emphasis added). After issuing a notice and allowing time for interested persons to comment, the agency must issue a “concise general statement” of the rule’s “basis and purpose” along with the final rule. § 553(c). One searches the text of APA § 553 in vain for a requirement that an agency disclose other agency information as part of the notice or later in the rule-making process.
But beginning with the Portland Cement case in 1973 — which was decided in an era when this Court created several procedural requirements not rooted in the text of the APA — our precedents have required agencies to disclose, in time to allow for meaningful comment, technical data or studies on which they relied in formulating proposed rules. See Portland Cement Ass’n v. Ruckelshaus, 486 F.2d 375, 392-93 (D.C.Cir.1973); see also Chamber of Commerce v. SEC, 443 F.3d 890, 899 (D.C.Cir.2006); Connecticut Light & Power Co. v. Nuclear Regulatory Comm’n, 673 F.2d 525, 530-31 & n. 6 (D.C.Cir.1982).
The majority opinion concludes that the Portland Cement requirement does not allow the FCC to redact portions of studies when the studies otherwise must be disclosed under Portland Cement. I accept the majority opinion’s conclusion as the best interpretation of our Portland Cement line of decisions.
I write separately to underscore that Portland Cement stands on a shaky legal foundation (even though it may make sense as a policy matter in some cases). Put bluntly, the Portland Cement doctrine cannot be squared with the text of § 553 of the APA. And Portland Cement’s lack of roots in the statutory text creates a serious jurisprudential problem because the Supreme Court later rejected this kind of freeform interpretation of the APA. In its landmark Vermont Yankee decision, which came a few years after Portland Cement, the Supreme Court forcefully stated that the text of the APA binds courts: Section 553 of the APA “established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures.” Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 524, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (emphasis added); see also Antonin Scalia, Vermont Yankee: The APA, the D.C. Circuit, and the Supreme Court, 1978 Sup. Ct. Rev. 345, 395-96 (Vermont Yankee was “a major watershed. It has put to rest the notion that the courts have a continuing ‘common-law’ authority to impose procedures not required by the Constitution in the areas covered by the APA.”).
Because there is “nothing in the bare text of § 553 that could remotely give rise” to the Portland Cement requirement, some commentators argue that Portland Cement is “a violation of the basic principle of Vermont Yankee that Congress and the agencies, but not the courts, have the power to decide on proper agency procedures.” Jack M. Beermann & Gary Lawson, Reprocessing Vermont Yankee, 75 Geo. Wash. L. Rev. 856, 894 (2007). At the very least, others say, the Supreme Court’s decision in Vermont Yankee raises “a question concerning the continuing vitality of the Portland Cement requirement that an agency provide public notice of the data on which it proposes to rely in a rulemaking.” 1 RichaRd J. PieRoe, AdministRAtive Law Treatise § 7.3, at 435 (4th ed.2002).
I do not believe Portland Cement is consistent with the text of the APA or Vermont Yankee. In the wake of Vermont *247 Yankee, however, this Court has repeatedly continued to apply Portland Cement (albeit without analyzing the tension between Vermont Yankee and Portland Cement ). In these circumstances, this three-judge panel must accept Portland Cement as binding precedent and must require the FCC to disclose the redacted portions of its staff studies. I therefore concur in the judgment as to Part IIB of the majority opinion.
II
The majority opinion also holds that the FCC did not provide a sufficiently “reasoned explanation” for its choice of an extrapolation factor to measure interference from broadband over power lines. I disagree.
The FCC estimates the radio-frequency interference caused by broadband over power lines to determine whether broadband over power lines will cause unlawful “harmful interference” to licensed radio operators. In selecting guidelines to estimate interference, the FCC has adhered to a pre-existing “extrapolation factor” that it already used to estimate interference caused by broadband over power lines and other regulated technologies. Amendment of Part 15 Regarding New Requirements and Measurement Guidelines for Access Broadband Over Power Line Systems, Carrier Current Systems, Report and Order, 19 F.C.C.R. 21265, 21310 ¶ 109 (2004). The National Telecommunications and Information Administration, a federal agency within the Department of Commerce, provided data supporting the existing extrapolation factor. Id. Another commenter, Ameren Energy Communications, also advocated this measurement. Id. By contrast, Aeronautical Radio, Inc. and ARRL, the petitioner here, sought the use of a different extrapolation factor. Id.
Given the “lack of conclusive experimental data” and disagreements among eom-menters, the Commission stated that it would continue to use the existing extrapolation factor. Id. The Commission added that it would “revisit” the issue if new information became available. Id.
In its reconsideration order, after receiving new studies conducted in the United Kingdom, the Commission found that those studies did not support a change to the extrapolation factor in light of the factual disagreements and uncertainty discussed in the initial order. The Commission stated: “No new information has been submitted that would provide a convincing argument for modifying this requirement at this time.” Amendment of Part 15 Regarding New Requirements and Measurement Guidelines for Access Broadband Over Power Line Systems, Mem. Op. and Order, 21 F.C.C.R. 9308, 9317-18 ¶26 (2006).
Applying the State Farm doctrine, the majority opinion remands for further explanation from the FCC. See Motor Vehicle Mfrs. Ass’n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Although I recognize that the reasoned decisionmaking requirement of State Farm is sometimes more art than science, more Rorschach than rule of law, I do not agree with the majority opinion that the FCC needs to say more in this case.
Section 706 provides that courts set aside agency rules that are “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” 5 U.S.C. § 706(2)(A). Arbitrary-and-capricious review under § 706 is “narrow,” and “a court is not to substitute its judgment for that of the agency.” State Farm, 463 U.S. at 43, 103 S.Ct. 2856. A reviewing court “may not set aside an agency rule that is rational, based on consideration of the relevant *248 factors, and within the scope of the authority delegated to the agency by the statute.” Id. at 42, 103 S.Ct. 2856. We thus must “ ‘uphold a decision of less than ideal clarity if the agency’s path may reasonably be discerned.’ ” Id. at 43, 103 S.Ct. 2856 (quoting Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)).
In my judgment, the FCC’s explanation in this case suffices. The FCC’s choice of extrapolation factor to estimate interference from broadband over power lines is a highly technical determination committed to the Commission’s expertise and policy discretion. Cf. Mobile Relay Assocs. v. FCC, 457 F.3d 1, 8 (D.C.Cir.2006); Teledesic LLC v. FCC, 275 F.3d 75, 84 (D.C.Cir.2001); American Iron & Steel Inst. v. EPA, 115 F.3d 979, 1004 (D.C.Cir.1997); MCI Cellular Tel. Co. v. FCC, 738 F.2d 1322, 1333 (D.C.Cir.1984). In its two orders, the Commission reasonably stated that the evidence submitted by commenters was conflicting, that the new evidence submitted on reconsideration was not sufficiently conclusive to require a change, and that it therefore would continue (for now) to adhere to its longstanding extrapolation factor with respect to broadband-overpower-lines technology. This explanation makes sense. And State Farm does not require a word count; a short explanation can be a reasoned explanation.
* * *
The two issues on which I write separately prompt a broader observation. In appropriate cases or controversies, courts of course must be vigilant in ensuring that agencies adhere to the plain text of statutes imposing substantive and procedural obligations. See, e.g., Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 & n. 9, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (Chevron “Step 1”); Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). But it bears repeating that § 553 of the APA requires only a notice providing a “description of the subjects and issues involved”; time for interested persons to comment; and a “concise general statement” of the rule’s “basis and purpose.” 5 U.S.C. § 553. Courts have incrementally expanded those APA procedural requirements well beyond what the text provides. And courts simultaneously have grown State Farm’s “narrow” § 706 arbitrary- and-capricious review into a far more demanding test. Application of the beefed-up arbitrary-and-capricious test is inevitably if not inherently unpredictable' — so much so that, on occasion, the courts’ arbitrary-and-capricious review itself appears arbitrary and capricious.
Over time, those twin lines of decisions have gradually transformed rulemaking— whether regulatory or deregulatory rule-making — from the simple and speedy practice contemplated by the APA into a laborious, seemingly never-ending process. The judicially created obstacle course can hinder Executive Branch agencies from rapidly and effectively responding to changing or emerging issues within their authority, such as consumer access to broadband, or effectuating policy or philosophical changes in the Executive’s approach to the subject matter at hand. The trend has not been good as a jurisprudential matter, and it continues to have significant practical consequences for the operation of the Federal Government and those affected by federal regulation and deregulation.